UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAURENCE WOLF, d/b/a
LAURENCE WOLF PROPERTIES, individually,
and on behalf of a class of similarly-situated
persons and entities,

        Plaintiff,

v.

CITY OF DETROIT,
a municipal corporation,

        Defendant.

Case No. 23-cv-11645
Hon. _____
Magistrate_____

_____

**PLAINTIFF'S CLASS ACTION COMPLAINT AND JURY DEMAND**

Plaintiff Laurence Wolf d/b/a Laurence Wolf Properties ("Plaintiff"), by his attorneys, Kickham Hanley PLLC, individually and on behalf of a class of similarly situated class members, state the following for his Class Action Complaint against the City of Detroit (the "City"):

**INTRODUCTION**

1.    This is a class action brought by and on behalf of residential landlords in the City of Detroit (the "City") challenging the City's unconstitutional practice of withholding, and/or requiring two Housing Assessment and Resource Agencies (a/k/a "HARAs") to withhold, a percentage of Covid emergency rental assistance funds ("CERA" funds) provided through federally-funded rental assistance programs. The

federal emergency rental assistance programs were designed to keep tenants in their homes while the country effectively was on lockdown by making rent payments directly to landlords that demonstrated eligibility for CERA payments (the "Eligible Landlords").

2.      In 2021, Congress passed the Consolidated Appropriations Act and the American Rescue Plan Act, 15 USCS § 9058a and 15 USCS § 9058c (Exhibit A hereto) (hereinafter, the "Relief Acts")—both of which included substantially similar provisions that provided for emergency rental assistance.

3.      Under the Relief Acts, billions in rental assistance funds were provided directly to states and local governments ("Grantees") for distribution to Eligible Landlords who could directly apply for rental assistance relief under state and locally created programs created solely to distribute these federal funds.[1]

4.      The City was a Grantee under the Relief Acts and operated as a fiduciary over the CERA Funds, utilizing local HARAs to facilitate distribution of the CERA

---

[1]      Tenants were also able to directly apply for CERA Funds. Regardless of whether a tenant or landlord applied, the determination of payment of CERA Funds was based upon the needs of the tenant. In order to demonstrate need, an applicant must show that they were obligated to pay rent and that they had suffered a significant financial hardship (*i.e.* unemployment and risk of tenant becoming homeless) due directly or indirectly to the Covid-19 pandemic. Regardless of who applied, under most circumstances the CERA Funds were intended to be paid directly to Eligible Landlords or utility providers if aid in utility payments was sought.

Funds to Eligible Landlords.[2]  The HARAs involved here are the Wayne Metropolitan Community Action Agency ("Wayne Metro") and the United Community Housing Coalition ("UCHC") which at all times acted as agents and representatives of the City in approving, administering, distributing and withholding the CERA Funds.  Neither the City nor the HARAs had a property interest in the CERA Funds once they were designated for Eligible Landlords, who had a vested property right to receive CERA Funds under the Relief Acts.

5.     Instead of distributing the entire amount of CERA Funds provided for and owed to Eligible Landlords as required under the Relief Acts, the City imposed unlawful additional and arbitrary requirements upon Eligible Landlords that had to be met before the City would permit the HARAs to fully release all CERA Funds to these landlords.

6.     Most specifically, the City required Eligible Landlords to first obtain a Certificate of Compliance (or "accepted exception" to same, *see* ¶ 37, *infra*) prior to all CERA Funds being distributed. The City's Certificate of Compliance ("CoC") was purportedly required to ensure that the leased premises were habitable.

7.     If no Certificate of Compliance was obtained by an otherwise Eligible Landlord and no "accepted exception" applied, then, under the City's directive, the

---

[2]     In September 2022, the CERA Program closed and stopped taking applications.

HARA distributed only 80% of CERA Funds to the Eligible Landlord and placed the remaining 20% into an escrow account until the Eligible Landlord obtained a Certificate of Compliance (or "accepted exception" to same, *see* ¶ 37, *infra*).

8.     The City's practice of requiring HARAs to escrow 20% of CERA Funds that rightfully belong to Eligible Landlords was not a requirement of the Relief Acts nor was it a federal requirement of any aspect of the CERA program. The practice of requiring HARAs to escrow 20% of CERA Funds was purely a City-imposed requirement that unlawfully deprived Eligible Landlords of millions of dollars that rightfully belonged to them.

9.     Worse, although the City mandated that Eligible Landlords must obtain a Certificate of Compliance (or "accepted exception" to same) to receive payment in full of CERA Funds, the City is months—in some cases even years—behind in processing applications made by Eligible Landlords for Certificates of Compliance.

10.     Thus, regardless of whether an applicant landlord met all of the requirements set forth under the Relief Acts and became an Eligible Landlord who was entitled to full payment of CERA funding under the Relief Acts, the City imposed yet another hurdle—the elusive Certificate of Compliance (or "accepted exception" to same, *see* ¶ 37, *infra*)—that the City simply could not timely provide even if the Eligible Landlord had timely applied for it.

11.     The City's practice of requiring HARAs to withhold 20% of the CERA Funds until a CoC (or "accepted exception" to same, *see* ¶ 37, *infra*) was obtained was

not only unconstitutional, but it capitalized on the financial hardship experienced by both landlords and tenants during the pandemic by enforcing—through the seizure of specific funds owned by Eligible Landlords—an arbitrary rule that was wholly unrelated to the purpose and intent of the Relief Acts and CERA funding.

12.     The City's practice of requiring the HARAs to withhold 20% of the CERA Funds provided under the Relief Acts constitutes a violation of the Eligible Landlord's rights under the Fifth Amendment of the U.S. Constitution because it provides for a taking of private property for a public purpose without just compensation or is, alternatively, an illegal exaction. The City's practice of withholding 20% of the CERA Funds from Eligible Landlords is also a conversion of funds that rightfully belong to the Eligible Landlords.

## JURISDICTION AND VENUE

13.     Plaintiff is an Eligible Landlord that operated within the City during the relevant time period, was granted CERA Funds under the Relief Acts but was denied 20% of the CERA Funds to which he was entitled through the City's unlawful policies, and seeks to act as class representative for all similarly situated persons and entities.

14.     Defendant City of Detroit is a Home Rule municipality located in Wayne County, Michigan.

15.     Non-party Wayne Metropolitan Community Action Agency ("Wayne Metro") is a Housing Assessment and Resource Agency operating within the City of Detroit under the City's control.

16.     Non-party United Community Housing Coalition ("UCHC") is a Housing Assessment and Resource Agency operating within the City of Detroit under the City's control.

17.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. 1331, because this Court has original subject matter jurisdiction of all civil actions arising under the U.S. Constitution and Plaintiff's claims include a claim arising under the 5th Amendment Takings Clause of the U.S. Constitution.  Plaintiff is entitled to enforce the Fifth Amendment Takings Clause through a civil action under 42 U.S.C. 1983.

18.     Venue is proper in this Court pursuant to 28 U.S.C. 1391(b)(1) because the City is located in this District and the actions which gave rise to Plaintiff's causes of action occurred in this District.

## GENERAL ALLEGATIONS

19.     On March 13, 2020, President Trump declared a national emergency in response to the Covid-19 pandemic. By March 18, 2020, the first federal Covid relief package—which guaranteed free testing and paid emergency leave—was signed into law.[3]

20.     On March 23, 2020, Governor Whitmer declared a state of emergency

---

[3]     Covid-19 Pandemic Timeline Fast Facts (July 10, 2023) https://www.cnn.com/2021/08/09/health/covid-19-pandemic-timeline-fast-facts/index.html

within Michigan and issued the "Michigan Stay Home, Stay Safe Order" which barred non-essential business activities, social gatherings, and events. Initially designed to restrict activity and business until April 13, 2020, this "stay-at-home" order was the first of many subsequent "emergency orders" issued by the state that restricted business activity and social gatherings until well into 2021, when finally, on June 7, 2021, Governor Whitmer rescinded all extant "emergency orders."[4]

21.    Starting in December 2020, as part of its sweeping Covid relief programs, the federal government created emergency rental assistance programs that made funding available to assist households that were unable to pay rent or utilities because of the lockdown restrictions imposed under such orders as the "Michigan Stay Home, Stay Safe" protocol.

22.    Two separate rental assistance programs were established by Congress, one under the Consolidated Appropriations Act of 2021 and the other under the American Rescue Plan Act of 2021. *See, e.g.,* US Treasury ERAP site[5]; 15 USCS § 9058a; 15 USCS § 9058c (Exhibit A hereto).

---

[4]    Michigan COVID-19 Timeline (July 10, 2023)
https://covidmapping.org/timeline.html

[5]    *See* U.S. Department Of The Treasury website:

https://home.treasury.gov/policy-issues/coronavirus/assistance-for-state-local-and-tribal-governments/emergency-rental-assistance-program (July 10, 2023).

https://home.treasury.gov/policy-issues/coronavirus/assistance-for-American-families-and-workers/emergency-rental-assistance-program (July 10, 2023).

23.     15 USCS § 9058a, entitled Emergency Rental Assistance ("ERA")

provides in pertinent part:

**(c) Use of funds.**

**(1)** In general. An **eligible grantee** shall only use the funds provided from a payment made under this section to provide financial assistance and housing stability services to eligible households.

**(2)** Financial assistance.

**(A)** In general. **Not less than 90 percent of the funds received by an eligible grantee** from a payment made under this section **shall be used to provide financial assistance** to eligible households, including the payment of

**(i)** rent;

**(ii)** rental arrears;

**(iii)** utilities and home energy costs;

**(iv)** utilities and home energy costs arrears; and

**(v)** other expenses related to housing incurred due, directly or indirectly, to the novel coronavirus disease (COVID-19) outbreak, as defined by the Secretary.

Such assistance shall be provided for a period not to exceed 12 months except that grantees may provide assistance for an additional 3 months only if necessary to ensure housing stability for a household subject to the availability of funds.

**(B)** Limitation on assistance for prospective rent payments.

**(i)** In general. Subject to the exception in clause (ii), an eligible grantee shall not provide an eligible household with financial assistance for prospective rent payments for more than 3 months based on any application by or on behalf of the household.

**(ii)** Exception. For any eligible household described in clause (i), such household may receive financial assistance for prospective rent payments for additional months:

**(I)** subject to the availability of remaining funds currently allocated to the eligible grantee, and

**(II)** based on a subsequent application for additional financial assistance provided that the total months of financial assistance provided to the household do not exceed the total months of assistance allowed under subparagraph (A).

**(iii)** Further limitation. To the extent that applicants have rental arrears, grantees may not make commitments for prospective rent payments unless they have also provided assistance to reduce an eligible household's rental arrears.

**(C) Distribution of financial assistance.**

**(i)** Payments.

**(I)** In general. **With respect to financial assistance for rent and rental arrears** and utilities and home energy costs and utility and home energy costs arrears provided to an eligible household from a payment made under this section, **an eligible grantee *shall* make payments to a lessor** or utility provider **on behalf of the eligible household**, except that, if the lessor or utility provider does not agree to accept such payment from the grantee after outreach to the lessor or utility provider by the grantee, the grantee may make such payments directly to the eligible household for the purpose of making payments to the lessor or utility provider. [15 USCS 9058a (LexisNexis, Lexis Advance through Public Law 117-214, approved October 19, 2022), attached hereto as Exhibit A (emphasis added)].[6]

**\*\*\*\***

**(f) Application for assistance by landlords and owners.**

**(1)** In general. Subject to paragraph (2), nothing in this section shall preclude a landlord or owner of a residential dwelling from—

**(A)** assisting a renter of such dwelling in applying for assistance from a payment made under this section; or

**(B)** applying for such assistance on behalf of a renter of such dwelling.

**(2)** Requirements for applications submitted on behalf of tenants. If a landlord or owner of a residential dwelling submits an application for

---

[6]     15 USCS § 9058c contains virtually identical language as 15 USCS § 9058a. *See* Exhibit A.

assistance from a payment made under this section on behalf of a renter of such dwelling—

**(A)** the landlord must obtain the signature of the tenant on such application, which may be documented electronically;

**(B)** documentation of such application shall be provided to the tenant by the landlord; and

**(C)** any payments received by the landlord from a payment made under this section shall be used to satisfy the tenant's rental obligations to the owner.

24.   Under the Relief Acts, billions of rental assistance funds were provided directly to states and local governments (and other tribes and territories) (the "Grantees") for distribution to qualifying landlords, utility providers, and renters. Grantees were expressly charged with using the funds to aid eligible households through existing or newly created rental assistance programs. [*Id., see also* fn. 3 *supra*.]. The State of Michigan and the City are "Grantees" under the Relief Acts.

25.   Emergency Rental Assistance ("ERA") Grantees were obligated to comply with the requirements outlined in their ERA Award Terms, including the relevant ERA statute, all other applicable federal statutes, regulations, executive orders, and Treasury's guidance (FAQs, reporting guidance, etc.). *See* US Treasury Guidance at p. 2 (Exhibit B, hereto).

26.   Michigan's Covid Emergency Rental Assistance Program ("CERA") was operated by the Michigan State Housing Development Authority ("MSHDA"). CERA was "designed to keep Michigan residents who fell behind on their rent and utilities

during the COVID-19 pandemic in their homes." *See* Exhibit C, State of Michigan's

COVID Emergency Rental Assistance Program Guidance, at p. 3.

27.     Landlords, like Plaintiff, were encouraged to apply to recover back rent

on behalf of their tenants, and eligibility for federal assistance was based upon the

tenant's financial hardship. *See* Exhibit D, "Help for Landlords" at p. 2.

28.     Plaintiff applied for CERA relief on behalf of certain of its tenants.

29.     A HARA was generally the first point of contact for an applicant seeking

relief under the CERA program and was charged with collecting the required

documentation to prove eligibility for CERA Funding. *See* Exhibit C, p. 39.

30.     Once a CERA application was granted and CERA Funds approved by the

HARA, the Eligible Landlord who rented to that tenant had a property interest in—*i.e.*,

was the legal owner of—100% of the allocated CERA Funds (the "Landlord's CERA

Funds").  At that point Grantees, like the City, were fiduciaries over the CERA Funds,

holding the Landlord's CERA Funds as a trustee for the benefit of the Eligible

Landlord.

31.     Local administration of CERA Funds, under MSHDA's guidance,

permitted additional rules and restrictions to be imposed upon recipients of the funds

in order to qualify for payment.[7] Specifically, MSHDA guidelines provided: "local programs may administer the CERA program with additional rules to coincide with existing local codes/ordinances so long as the additional rules do not conflict with US Treasury regulations or slow the pace of serving eligible tenants and landlords." *See* Exhibit C, p. 3; MSHDA CERA Guidelines, Exhibit E hereto, at p. 5.

32.     MSHDA's guidance does not have the force of law but, even if it did, the guidance conflicts with the governing provisions of the Relief Acts because it authorized additional restrictions on the distributions of CERA Funds that were not set forth in the Relief Acts.

33.     Indeed, MSHDA's Guidelines are preempted by federal law because they conflict with the emergency rental assistance statutes stated in 15 USCS § 9058a and 15 USCS § 9058c and stand as an obstacle to the accomplishment and execution of the full purpose and objective of Congress under the Relief Acts—which is to provide timely rental assistance to eligible households.

34.     In any event, the City's actions in imposing the CoC (or "accepted exception" to same, *see* ¶ 37, *infra*) were prohibited by the MSHDA Guidelines because they "slow[ed] the pace of serving eligible tenants and landlords."

---

[7]     Upon information and belief, MSHDA's Guidelines that permitted the implementation of "additional qualifying rules" were crafted at the City's request to serve the City's interests.

35.    In the City, Eligible Landlords who had satisfied all of the requirements of the Relief Acts, still could not receive all of the CERA Funds to which they were entitled unless their residential rental properties were: (a) registered with the City, (b) subject to periodic inspections for code compliance, and (c) had obtained a Certificate of Compliance. *See* Exhibit F, COVID19 Emergency Rental Assistance (CERA) Rental Compliance Guide.

36.    Thus, the City's implementation and oversight of the CERA program included additional requirements **not** contained in the federal statute, but which had to be met before the City would permit a HARA to fully release the federally-granted CERA Funds to an Eligible Landlord. Importantly, however, none of the additional and arbitrary requirements imposed by the City were lawful under the Relief Acts.

37.    Specifically, the City imposed the following requirements upon an applicant landlord:

1.  **100% OF THE FUNDS WILL BE RELEASED** if all CERA eligibility requirements are met and the property has one of the following:

    a.  **Certificate of Compliance** (CoC), or

    b.  **Rental Registration** and an accepted **CoC CERA Exception**, examples include:

        i.  Housing Quality Standards (HQS) for Housing Choice Voucher accepting properties, or an active passing REAC score for publicly assisted housing; or

        ii.  Written acknowledgement by BSEED (the City's "Buildings, Safety Engineering, and Environmental Department") that the property is effectively in

compliance, and the lack of CoC is due to factors unrelated to the conditions of the home;

iii. Mutual agreement of the landlord and tenant that the condition of the home is of a high standard and all parties wish to proceed without further intervention. [Please note, examples ii. And iii. Under the accepted CoC CERA Exceptions require that the property must have a current "passed" BSEED rental inspection.]

2. **80% OF THE FUNDS WILL BE DISBURSED TO THE LANDLORD, AND 20% WILL BE PAID INTO AN ESCROW ACCOUNT** if there is no CoC or Accepted COC CERA Exception but the property is habitable (per MSHDA guidance relating to units with imminent threats to health and safety). The following outlines the process:

   a. A conditional dismissal or settlement agreement will be established to outline the plan for repairs to the home and/or CoC compliance within an agreed upon timeline. The timeline for these repairs will be decided between the parties, the default time is 3 months.

   b. The landlord becomes eligible to receive the 20% held in escrow if they complete the rental registration and do either of the following:

      o Obtain a CoC or accepted CoC CERA Exception and provide proof of same; or

      o Complete the repairs/improvements to the rental property for compliance-related repairs as outlined in the conditional dismissal or settlement agreement in an amount equal to or greater to the 20% escrowed amount. Landlord will provide documentation od repairs to tenant counsel or processor, including proof of payment/receipts and a signed Affirmation of Repairs and Costs. Inspection costs may be included as repair costs. [Please note, the release of CERA funds *does not exempt* the landlord from meeting CoC requirements under local ordinance.]

3. **HEALTH AND SAFETY** If there is no CoC, or an accepted CoC CERA Exception, and the property is considered uninhabitable according to MSHDA rules, the landlord is not eligible to receive over

50% of CERA funds. The other 50% of the funds will be placed in escrow until the habitability issue is corrected.

- If, upon resolving the habitability issue, the property does not have a CoC or an accepted CoC Exception, 30% of the full payout will be released to the landlord, the remaining 20% will be held in escrow, and the 80/20 process will be initiated.

*See* Exhibit F at pp. 1-2.

38.   The City's requirement that its HARAs place rent into escrow was blessed by MSHDA under circumstances where the rental unit posed a threat to health and safety: "rent payments should be held by the agency or put into escrow until it has verified both with the tenant and in writing that the repairs have been made." Moreover, "50% of the CERA Funds may be provided to the landlord to effect the needed repairs." Exhibit C, Program Guidance, at p, 25.

39.   Plaintiff was awarded and received CERA Funds based upon its applications made on behalf of certain of its tenants but was denied full payment of its CERA Funds because of the City's requirement that HARAs escrow 20% of CERA Funds awarded until a CoC or exception to same was acquired.

40.   Plaintiff applied for and attempted to acquire a CoC but was unable to obtain a CoC from the City despite Plaintiff's extended efforts to do so over a period of months.

41.   The City's requirement that its HARAs withhold 20% (or even 50% under certain circumstances) violates the Relief Acts' requirement that "**not less than 90 percent of the funds received by an eligible grantee** from a payment made under

this section **shall be used to provide financial assistance**. *See* 15 USCS § 9058a (c)(2)(A), Exhibit A hereto.

42.   Importantly, under the Relief Acts, the City, as Grantee, and its HARAs as the local service providers are required to distribute the CERA Funds to Eligible Landlords unless the Eligible Landlord does not agree to accept CERA funding—only then may the HARA distribute CERA funding directly to an eligible household. *See* 15 USCS § 9058a (C)(i)(I):

> **With respect to financial assistance for rent and rental arrears** and utilities and home energy costs and utility and home energy costs arrears provided to an eligible household from a payment made under this section, **an eligible grantee *shall* make payments to a lessor** or utility provider **on behalf of the eligible household**, except that, if the lessor or utility provider does not agree to accept such payment from the grantee after outreach to the lessor or utility provider by the grantee, the grantee may make such payments directly to the eligible household for the purpose of making payments to the lessor or utility provider.

43.   In order to obtain distribution of **any** of the CERA Funds to which the Eligible Landlord has demonstrated it is entitled, the City, through its HARAs, coerced Eligible Landlords, like Plaintiff, to "agree" to the 20% escrow in "consent agreements" that require Eligible Landlords to obtain a CoC within a certain number of days—or forfeit the remaining funding.  Such consent agreements reflect the Eligible Landlord's effort to mitigate the financial consequences of the City's unlawful actions.  Predictably, though Eligible Landlords attempted to obtain a CoC (or "accepted exception") under these "consent agreements" they were unable to because of the City's sheer inability or unwillingness to timely provide the CoC (or "accepted exception").

44.   If an Eligible Landlord balked at the 20% escrow requirement imposed by the City and did not "agree" to the unilaterally imposed and non-negotiable "consent agreement," then that otherwise Eligible Landlord received no CERA funding.  If the Eligible Landlord "agreed" to the "consent agreement" in order to obtain 80% of the CERA Funds owed to that landlord it was virtually impossible for that otherwise Eligible Landlord to obtain a CoC (or "accepted exception") and receive the remaining 20% owed.

45.   When the Eligible Landlord failed to obtain the CoC (a process that was totally within the City's control), the CERA Funds were either held in escrow or, in some cases, paid directly to the tenant to be used as the tenant sees fit—depriving Eligible Landlords access to specific funds that are rightfully theirs under the Relief Acts and providing a windfall to tenants who are not required to, and have no legal incentive to, forward these funds to Eligible Landlords to pay their rental arrears.[8]

46.   Thus, despite the fact that CERA Funds were designed to pay rent to Eligible Landlords and alleviate rental arrearage in order to keep tenants in their homes, the City arbitrarily withheld, escrowed, or reallocated to tenants 20% of the rent that rightfully belonged to Eligible Landlords—who were without recourse to collect it.  Worse, Eligible Landlords were not provided notice of when the HARA reallocated

---

[8]     A CERA Fund Payment made directly to a tenant who was under no legal obligation to forward it to the Eligible Landlord was effectively a windfall to the tenant.

the CERA Funds to tenants and were not provided an opportunity to contest the reallocation of 20% of their CERA Funds to a tenant who has failed to pay rent in the first instance.[9]

## CLASS ALLEGATIONS

47.     Plaintiff brings this action as a class action, pursuant to F. R. Civ. P. 23, individually and on behalf of a proposed class consisting of all persons or entities who/which were Eligible Landlords under the Relief Acts and had 20% of their CERA Funds withheld by the City.

48.     The members of the Class are so numerous that joinder of all members is impracticable. Indeed, while the number of Eligible Landlords is not yet known, the number of Eligible Landlords is most certainly in the hundreds, if not in the thousands.

49.     Plaintiff's claims are typical of the claims of members of the Class. Plaintiff is a member of the Class it seeks to represent, and Plaintiff was injured by the same wrongful conduct that injured the other members of the Class.

50.     The City has acted wrongfully in the same basic manner as to the entire class.

---

[9]      Upon information and belief, UCHC placed the 20% withheld from an Eligible Landlord's CERA Funding into an escrow account with the 36th District Court, where ostensibly, the CERA Funds could only be released via settlement or motion. Upon information and belief, Wayne Metro escrowed the 20% withheld in its own accounts and, upon information and belief, in many cases released those funds without notice to Eligible Landlords.

51.     There are questions of law and fact common to all Class Members that predominate over any individualized questions and that will be proved using the same evidence for each member. These predominant common questions of law and fact necessitate a class action proceeding in order to generate common answers, drive the resolution of the litigation, and include by way of example and not limitation:

     a.    Whether or not the City effected a taking under the Fifth Amendment of the Constitution by requiring the withholding and/or reallocation of specific property that belonged to Plaintiff and members of the putative Class;

     b.    Whether or not the City has converted specific and identifiable funds by requiring the withholding and/or reallocation of the CERA Funds that rightfully belonged to Plaintiff and members of the putative Class;

     c.    Whether  the City has converted specific and identifiable funds by withholding and/or reallocating the CERA Funds that rightfully belonged to Plaintiff and members of the putative Class;

     d.    Whether the retention by the City (by and through its agents, the HARAs) of 20% of an Eligible Landlord's CERA Relief Funds constitutes an "illegal exaction" by the City; and

     e.    Whether the HARAs are agents of the City for purposes of administering and distributing the CERA Funds.

52.     Plaintiff will fairly and adequately protect the interests of the Class, and Plaintiff has no interests antagonistic to those of the Class.  Plaintiff is committed to the vigorous prosecution of this action and has retained competent and experienced counsel to prosecute this action.

53.     The prosecution of separate actions would create a risk of inconsistent or varying adjudications.  Furthermore, the prosecution of separate actions would substantially impair and impede the ability of individual class members to protect their interests.  In addition, since individual refunds may be relatively small for some members of the class, the burden and expense of prosecuting litigation of this nature makes it unlikely that members of the class would prosecute individual actions.

54.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

55.     Plaintiff and his counsel anticipate no difficulty in managing this action as a class action.

**COUNT I**

**42 U.S.C. § 1983**

**VIOLATION OF FIFTH AMENDMENT TAKINGS CLAUSE**

56.     Plaintiff incorporates each of its preceding allegations as if fully set forth herein.

57.     Amendment Five to the U.S. Constitution provides that private property shall not "be taken for public use, without just compensation." This prohibition applies

against the states through the Fourteenth Amendment. *Webb's Fabulous Pharmacies, Inc v Beckwith*, 449 U.S. 155, 160; 101 S Ct 446; 66 L Ed 2d 358 (1980); *K & K Construction, Inc v Dep't of Natural Resources*, 456 Mich. 570, 576 n 3; 575 NW2d 531 (1998).

58.     The Takings Clause is "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

59.     The Eligible Landlords have a cognizable property interest in the CERA Funds under the Relief Acts.

60.     The City has asserted ownership of a specific and identifiable parcel of the Eligible Landlords' money—here the City has permanently or temporarily seized and/or impaired the Eligible Landlords' property interest in the CERA Funds for a public use without paying Eligible Landlords just compensation.

61.     A *per se* taking occurs when a property owner suffers a permanent, physical invasion, without just compensation, of any portion of the property. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 73 L. Ed. 2d 868, 102 S. Ct. 3164 (1982).

62.     U.S. Supreme Court decisions have made clear that the government effects a "per se" taking when it seizes a specific, identifiable "parcel" of money. *See, e.g., Brown v. Legal Found. of Washington*, 538 U.S. 216, 224, 235, 123 S. Ct. 1406, 155 L. Ed. 2d 376 (2003); *Koontz v. St. Johns River Water Management District*, 133 S.Ct. 2586, 2596, 186 L.Ed.2d 697 (2013).

63.     The City's actions in requiring the HARAs to withhold 20% of CERA funding, and the HARAs act of withholding CERA Funding (as required by the City) from Eligible Landlords are an overt confiscation of specific property of these Eligible Landlords and  constitute a per se taking of Eligible Landlords' property by the City in violation of the Fifth Amendment.  The City is legally responsible for the actions of its agents, the HARAs.  *See, e.g.*, *Lion Raisins, Inc v United States*, 416 F3d 1356, 1362-63 (CA Fed, 2005); *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 21-22, 84 L. Ed. 554, 60 S. Ct. 413 (1940).

64.     The Eligible Landlords have been harmed by the City's unlawful practice because they have been unconstitutionally deprived of specific property that is rightfully and legally owned by them.

65.     The City's unconstitutional practices require that it pay just compensation to the Eligible Landlords in the amount of the CERA Funds it has unlawfully withheld.

66.     42 U.S.C. § 1983 provides as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. …

67.     The City is a "person" under 42 U.S.C. Section 1983.

68.     The City's actions were taken under color of federal and state law pursuant to an official policy and practice of the City.

- 22 -

69.     The City's actions deprived the Eligible Landlords rights owed to them and secured by the Constitution and the Federal Relief statutes.

70.     The City's actions have deprived Plaintiff and the Class of their property rights in violation of the Fifth Amendment.

71.     The City's actions have violated the Federal Relief statutes, 15 USCS § 9058a and 15 USCS § 9058c.

72.     Plaintiff and the Class of similarly situated Eligible Landlords have been damaged by the City's  unlawful actions.

## COUNT II

## 42 U.S.C. § 1983

## ILLEGAL EXACTIONS

73.     Plaintiff incorporates each of the preceding paragraphs as if fully set forth herein.

74.     An illegal exaction claim may be brought where "(1) money was taken [from the plaintiff] by the government and (2) the exaction violated a provision of the Constitution, a statute, or a regulation." *Piszel v. U.S.*, 121 Fed. Cl. 793, 801 (2015) (citation omitted), *aff'd*, 833 F.3d 1366 (Fed. Cir. 2016).  "The claim must assert that the value sued for was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Eastport Steamship Corp. v. U.S.,* 372 F.2d 1002, 178 Ct. Cl. 599, 605 (1967).

65.     Exactions can be "direct" when money was paid directly to the Government or "in effect" when money "was paid to others at the direction of the government to meet a governmental obligation." *Aerolineas Argentinas v. U.S.,* 77 F.3d 1564, 1572-73 (Fed. Cir. 1996).  In the latter case, "the government has 'in its pocket' money corresponding to the payments that were the government's . . . obligation" to make.  *Id.* at 1573; *Clapp v. U.S.*, 117 F.Supp. 576, 127 Ct. Cl. 505, 512 (1954) (describing illegal exaction as occurring when "the Government has the citizen's money in its pocket.").

66.     The retention of 20% of an Eligible Landlord's CERA Relief Funds by the HARAs at the City's direction constitutes either a direct or "in effect" exaction of money retained by agents of the City which violated provisions of federal statutes—the Relief Acts.

67.     The Eligible Landlords have a cognizable property interest in the 20% of the Relief Funds retained by the HARAs at the City's direction.

68.     Plaintiff and the Class have been harmed by the City's and its agents' unlawful practice of illegal exactions because they have been deprived of specific property that is rightfully and legally owned by them.

69.     The City's and its agents' illegal practices require that they disgorge and pay to Plaintiff and the Class the amount of the Relief Funds the City has illegally exacted though its agents.

## COUNT III

## COMMON LAW & STATUTORY CONVERSION

75.     Plaintiff incorporates each of the preceding paragraphs as if fully set forth herein.

76.     The City's unlawful seizure of CERA Funds that rightfully belong to Plaintiff and the Class represents an act of conversion because the City has wrongfully exerted dominion or control over Plaintiff's and the Class's property.

77.     Plaintiff and the Class have been damaged by the City's conversion of the CERA Funds.

78.     Pursuant to MCL § 600.2919a, because the City has converted funds that rightfully belong to the Eligible Landlords, Plaintiff and the Class are entitled to treble damages and an award of attorneys' fees and costs.

79.     As a direct and proximate result of the City's misconduct, Plaintiff and the Class have been harmed—collectively suffering a loss of millions of dollars.

## PRAYER FOR RELIEF

Plaintiff requests that the Court grant the following relief:

A.     Certify this action to be a proper class action with Plaintiff certified as Class Representative and Kickham Hanley PLLC designated Class Counsel;

B.     Define the Class to include all persons and/or entities who/which were Eligible Landlords that had been granted CERA Funds under the Relief Statutes, but

which 20% of the CERA Funds granted were withheld by the City through its agents, the HARAs between January 2021 and December 2022;

C . Find and declare that the City has violated the Fifth Amendment takings clause of the Constitution by withholding and/or reallocating CERA Funds from Plaintiff and the Class and order that the City reimburse Plaintiff and the Class for all CERA Funds that rightfully belong to them;

D. Find and declare that the City, by and through its agents, has illegally exacted a percentage of the Relief Funds owned by the Class of Eligible Landlords and order that the City reimburse the Class for all Relief Funds illegally exacted

E. Find and declare that the City, by and through its agents, has converted CERA Funds by wrongfully exerting dominion or control over Plaintiff's and the Class's property and order that the City reimburse Plaintiff and the Class for all converted CERA Funds that rightfully belong to Plaintiff and the Class;

F. Find and declare that the City, by and through its agents, has converted CERA Funds by wrongfully exerting dominion or control over Plaintiff's and the Class's property and award Plaintiff and the Class treble damages pursuant to MCL § 600.2919a.

G. Award Plaintiff and the Class pre-filing, prejudgment and post-judgment interest on the amounts the City is required to pay to compensate members of the Class

H. Award Plaintiff and the Class the costs and expenses incurred in this action, including reasonable attorneys', accountants', and experts' fees; and

I.  Grant any other appropriate relief.

        */s/ Gregory D. Hanley*     
        Gregory D. Hanley
        Kickham Hanley PLLC
        32121 Woodward Avenue, Suite 300
        Royal Oak, Michigan 48073
        (248) 544-1500
        ghanley@kickhamhanley.com
        P51204
        Counsel for Plaintiff and the Putative Class

Date: July 11, 2023

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 11, 2023, I electronically filed the ***Plaintiff's Class Action Complaint and Jury Demand*** with the Clerk of the Court using the electronic filing system.

<u>*/s/ Kim Plets*</u>
Kim Plets