## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

LAURENCE WOLF, doing business as
LAURENCE WOLF PROPERTIES,

      Plaintiff,

v.

CITY OF DETROIT,

      Defendant.

_____/

Case No. 2:23-cv-11645
Hon. Brandy R. McMillion
United States District Judge

## <u>OPINION AND ORDER DISMISSING CASE FOR LACK OF STANDING</u>

Pending before the Court is Plaintiff Laurence Wolf's ("Wolf") Motion for Partial Summary Judgment on the Issue of Obstacle Preemption (ECF No. 50). While reviewing the briefing for that Motion, the Court came to question Wolf's standing to sue Defendant City of Detroit (the "City") and, thus, the Court's subject-matter jurisdiction over this case. The Court ordered limited supplemental briefing on the standing issue, which the parties timely submitted (in addition to Wolf asking for leave to file a third amended complaint), and held an in-person hearing on the issue on July 21, 2025. *See* ECF Nos. 60, 61, 64, 65, 66. Following the hearing, Wolf submitted supplemental exhibits, the contents of which were discussed at the hearing. *See* ECF No. 68. For the reasons that follow, the Court **DISMISSES** the case because Plaintiff lacks standing; **DENIES AS MOOT** Plaintiff's Renewed

1

Motion for Partial Summary Judgment on the Issue of Obstacle Preemption (ECF No. 50); and **DENIES AS FUTILE** Plaintiff's Motion for Leave to File Third Amended Complaint to Add Third Party Defendants (ECF No. 64).

## I.

This case concerns the federal, state, and local responses to the COVID-19 pandemic with respect to the rental market.  Wolf, a Detroit landlord, contends that the City improperly withheld certain rental assistance funds he had been awarded on behalf of some of his tenants.

## A.    Federal Response to the Pandemic

The Court previously described the relevant pandemic-era federal statutes addressing rental assistance as follows:

> Congress responded to the economic disruption caused by the COVID-19 pandemic by enacting rental assistance programs.  These programs were enacted through the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"); the Consolidated Appropriations Act of 2021 ("CAA"); and the American Rescue Plan Act of 2021 ("ARPA").  *See* Pub. L. No. 116-136, 134 Stat. 281 (2020) (codified at 15 U.S.C. ch. 116); Pub. L. No. 116-260, § 501, 134 Stat. 1182, 2069-79 (2020) (codified at 15 U.S.C. § 9058a) [became law on December 27, 2020]; Pub. L. No. 117-2, § 3201, 54-58 (2021) (codified at 15 U.S.C. § 9058c) [became law on March 11, 2021].  The CAA and the ARPA are the focus here.

> Under the CAA, Congress appropriated billions of dollars to states and local governments—limiting the use of those funds to "provide financial assistance and housing stability services to eligible households."  15 U.S.C. § 9058a(c)(1).  At least 90% of the funds received by state and local entities had to be put toward providing financial assistance to eligible households for the payment of rent,

utilities and home energy costs, and "other expenses related to housing incurred due, directly or indirectly," to the pandemic. 15 U.S.C. § 9058a(c)(2)(A)(*i*)-(*v*). The CAA also allowed landlords to apply for assistance on behalf of their tenants (subject to certain requirements). *See* 15 U.S.C. § 9058(f). States or local governments had to pay landlords or utility providers on behalf of eligible households when awarding financial assistance, unless the landlord or utility provider did not agree to accept the funds, in which case payment went directly to the tenant for the purpose of paying the landlord or utility provider. 15 U.S.C. § 9058a(c)(2)(C)(i)(I). The ARPA appropriated billions more for the 2021 fiscal year. 15 U.S.C. § 9058c(a)(1). Funds received by grantees under the ARPA could be paid to eligible households for largely the same things as under the CAA, including rent and rental arrears. *Compare* 15 U.S.C. § 9058c(d)(1)(A)(i)(I)-(V) *with* 15 U.S.C. § 9058a(c)(2)(A)(i)-(v).

ECF No. 41, PageID.1252-1253 (footnote omitted). The CAA and the ARPA remain the focus here.[1] The funds made available under the Relief Acts are colloquially known as COVID Emergency Rental Assistance ("CERA" or "ERA") funds. *See* ECF No. 50, PageID.1691; ECF No. 55, PageID.2109. Those funds can be further distinguished as "ERA-1" (funds authorized by the CAA) and "ERA-2" (funds authorized by the ARPA). *See* ECF No. 55, PageID.2109.

## B.     State and Local Responses to the Pandemic

Next is the State of Michigan's rental assistance program, which the Court previously described as follows:

> To assist in the distribution of federal funds, the State of Michigan designed the COVID Emergency Rental Assistance Program ("CERA Program" or "the Program") "to keep Michigan residents who

---

[1] Wolf refers to the CAA and ARPA collectively as the "Relief Acts," so the Court will adopt that terminology.

fell behind on their rent and utilities during the COVID-19 pandemic in their homes."   The Michigan State Housing Development Authority ("MSHDA") administered the Program.   Funds available for other assistance totaled $560 million and were to be "distributed through MSHDA's network" and eventually "sub-granted to Housing Assessment and Resource Agencies ["HARAs"] and other local service agencies."   The service agencies were to "work with tenants and landlords to provide rental, utility and internet assistance for eligible renter households."

The CERA Program tasked organizations, including HARAs, with designing local processes that, in part, helped tenants remain housed and landlords recoup rent.   The Program used "a collaborative community process to expedite rental and utility assistance to COVID-19 affected tenants and their landlords."   And, important here, "[b]ased on consultation with MSHDA," local programs could "administer the CERA program with additional rules to coincide with existing local codes/ordinances . . . ."   Those additional rules, however, could not "conflict with US Treasury regulations or slow the pace of serving eligible tenants and landlords."

ECF No. 41, PageID.1254-1255 (internal citations omitted).

The City advised the Court that there's more to its CERA program (and the State of Michigan's) than previously addressed.  *See* ECF No. 55, PageID.2118-2122.  Treasury sent the "first tranche of CERA funds authorized under the CAA" to Michigan in early 2021.  ECF No. 55, PageID.2118 (citing ECF Nos. 55-2, PageID.2153; 55-3, PageID.2215-2216; 55-4, PageID.2273).  Michigan, through MSHDA, forwarded those funds authorized under the CAA to the Homeless Action Network of Detroit ("HAND"), which then sent the funds to HARAs to disburse assistance to Detroit households.  ECF No. 55-2, PageID.2152; ECF No. 55-3, PageID.2215-2216; ECF No. 55-4, PageID.2273-2274.

Critical to the standing inquiry here, MSHDA itself did not send any ERA-1 funds (those authorized under the CAA) to the City.  ECF No. 55-2, PageID.2152.  In short, Detroit residents (and landlords) received CAA-authorized funds through a trickledown network: starting with Treasury to the State of Michigan, then the State, through MSHDA, to HAND, and, finally, to the HARAs.  Although the City couldn't control how the HARAs processed applications for ERA-1 funds, it informed MSHDA, HAND, and the HARAs that it was "developing its own CERA program" for funds it "expected to receive through [the] ARPA," including mention of a policy that would require retention of a portion of an award of funds if a rental property lacked a "Certificate of Compliance."  ECF No. 55-2, PageID.2153.  The City thus asked MSHDA, HAND, and the HARAs to follow "the same process" for "applications involving Detroit tenants under the CAA."  *Id.* at PageID.2153-2154.  "MSHDA, HAND[,] and the HARAs did so."  *Id.* at PageID.2154-2155.

The City was not a direct recipient of CERA funds from Treasury until the enactment of the ARPA (the ERA-2 funds).  *See* ECF No. 55-2, PageID.2153; ECF No. 55-3, PageID.2216; ECF No. 55-4, PageID.2274.  The City distributed these ERA-2 funds through its own CERA program, sending them to HARAs for distribution under the City's approved terms and conditions.  *See* ECF No. 55-2, PageID.2152-2153.  The State also received ERA-2 funds from Treasury,

distributing those funds through the same HAND-HARA network as with the ERA-1 funds.  *See* ECF No. 55-3, PageID.2216.

Overarching the City's CERA program were two City code requirements: Detroit City Code §§ 8-15-81(a) and 8-15-82.  Section 81(a) required owners to register their rental property with the City's building department and obtain a certificate of registration.  ECF No. 55-5, PageID.2288.  Section 82 barred rental property owners from collecting rent from a tenant if the rental property did not have a valid Certificate of Compliance.  *Id.* at PageID.2288-2289.  These provisions undergird the City's CERA program by linking a rental property's Certificate status to a landlord's receipt of CERA funds:

- When a tenant met all eligibility requirements and the rental property had either (1) an active Certificate or (2) a rental registration certificate and an exception to the Certificate requirement ("Exception"),[2] 100% of potential rental payments (calculated by the HARAs) were released. ECF No. 50-2, PageID.1903.

- Habitable rental properties without a Certificate (or those lacking a rental registration certificate and an Exception) would have 80% of the potential rental payments (as determined by the HARAs) released to the landlord.  The other 20% was escrowed.  This "80-20 requirement" is the focus of this lawsuit.  *Id.* at PageID.1904.

---

[2] The City's materials include three examples of what qualified as an Exception: (1) the rental unit had received a "Housing Quality Standards (HQS) for Housing Choice Voucher" for compliance with U.S. Department of Housing and Urban Development standards, or had an active and passing score from the Real Estate Assessment Center; (2) the City's building department gave written acknowledgment that the property was "effectively in compliance" and only lacked a Certificate for reasons "unrelated to the conditions of the home"; or (3) the landlord and tenant mutually agreed that the property's condition was "of a high standard" and they "wish[ed] to proceed without further intervention."  ECF No. 50-2, PageID.1903-1904.

- Landlords could secure release of the escrowed 20% in one of two ways: (1) obtain a Certificate or Exception or (2) complete repairs to the rental property that at least equaled the amount in escrow.  *Id.*

- If the rental property lacked a Certificate or Exception and it was uninhabitable, only 50% of the CERA funds were released to the landlord.  The other 50% was escrowed until the property was made habitable.  Once that happened, the HARAs either initiated the 80-20 process, or paid the remaining 50% (assuming the property met the other requirements).  *Id.*

The State of Michigan and the City of Detroit thus each had their own CERA programs.  *See* ECF No. 55-2, PageID.2148, 2152-2159.  The City, however, identifies four overlapping areas between the state and local programs:

> (1) The same HARAs administered the two programs;
>
> (2) The HARAs applied the 80-20 program guidelines to all CERA funding applications from Detroit tenants, whether for funding under the CAA or the ARPA;
>
> (3) The City and its HARAs used some of MSHDA's forms to process ARPA-based applications; and
>
> (4) MSHDA created a database to track CERA applications, which the HARAs used to track applications and payments under the CAA and ARPA; this, in turn, meant that data for applications under the City's program and MSHDA's was maintained in MSHDA's database.

ECF No. 55, PageID.2125 (citing ECF No. 55-2, PageID.2150-2159).

The HARAs administered both the State's program and the City's program.  ECF Nos. 55-2, PageID.2150-2152; 55-3, PageID.2215-2216, 2218-2219; 55-4, PageID.2273-2274, 2276-2277.  In doing so, the HARAs applied the City's 80-20 requirement to all Detroit applications.  ECF Nos. 55-2, PageID.2153-2154; 55-3,

PageID.2218, 55-4, PageID.2276.  HARAs reviewed applications to make sure the applicant had provided the information necessary for the HARAs to determine a household's eligibility for funds under the CAA or ARPA.  ECF Nos. 55-2, PageID.2156; 55-3, PageID.2220; 55-4, PageID.2226-2227.   Assuming that information was provided, the HARAs then used an MSHDA-generated "worksheet template" listing different types of assistance that were utilized to determine the "maximum potential amount of CERA assistance that could be paid."  ECF Nos. 55-2, PageID.2156-2157; 55-3, PageID.2220; 55-4, PageID.2276-2277.  According to the City, the "maximum potential figure" was approved, not awarded.  ECF Nos. 55-2, PageID.2156-2157; 55-3, PageID.2220; 55-4, PageID.2277.[3]  After calculating this "potential maximum" with an MSHDA worksheet template, the HARAs sent the worksheet and a "Settlement Statement" to the landlord.  ECF Nos. 55-2, PageID.2157-2158; 55-3, PageID.2221; 55-4, PageID.2277; 55-6.  The Settlement Statement informed the landlord that only 80% of the potential total rent owed by the tenant would be awarded unless their rental property had a Certificate or Exception.  *See* ECF No. 55-6.  The HARAs would then apply the City's CERA

---

[3] Plaintiff disputes this—arguing that the funds were more than just "approved," they were "awarded."  *See* ECF No. 50, PageID.1673-1674, 1687-1689.  This argument was also asserted in response to Defendant's Motion to Dismiss (*see* ECF No. 31, PageID.1109-1111, 1124-1128).  At that time, based on the pleadings, the Court could reasonably infer that the City "awarded" the funds for the sake of evaluating the motion to dismiss; however, it noted that in practice that may not have been the case.  *See* ECF No. 41, PageID.1271-1273.  The Court does not answer the approved-versus-awarded question here.

program requirements—including the 80-20 requirement—to calculate the award amount.   ECF Nos. 55-2, PageID.2157; 55-3, PageID.2220-2221; 55-4, PageID.2277.

The process differed if a landlord had a pending eviction lawsuit against a tenant. ECF Nos. 55-2, PageID.2158; 55-3, PageID.2221; 55-4, PageID.2277-2278; 55-7, 55-8.   In that instance, the HARAs "provide[d] counsel to the tenants" and tried to "reach a settlement."   ECF Nos. 55-2, PageID.2153, 2158; 55-3, PageID.2221-2222; 55-7; 55-8.   Settled cases were "memorialized in a court order" with an addendum "explicitly acknowledg[ing] that only 80% of the total rent owed" was awarded, save where the 80-20 requirements were met.   ECF No. 55, PageID.2127 (citing ECF Nos. 55-2, PageID.2158; 55-3, PageID.2221; 55-4, PageID.2277; 55-7; 55-8).   These documents (the order and addendum) were signed by the landlord's attorney. *See* ECF Nos. 55-7, 55-8.   If, however, the rental property didn't meet the 80-20 requirements, the 20% was usually paid to the court to be held in escrow.   ECF Nos. 55-2, PageID.2158; 55-3, PageID.2221-2222; 55-4, PageID.2277-2278.   In the end, the "final disposition of the escrowed funds" was determined by court order and "stipulated to and signed by the landlord" or their attorney.   ECF No. 55, PageID.2127 (citing ECF No. 55-8).

C.      **Plaintiff Wolf's Applications for CERA Funds**

Wolf, a landlord in Detroit, applied for CERA funds on behalf of some of his tenants.  ECF No. 55, PageID.2129 (citing ECF No. 47, PageID.1503, 1509); *see* ECF Nos. 55-7, 55-8).  Each application made by one of Wolf's tenants, or by Wolf on a tenant's behalf, was "made under the MSHDA/HAND program funded by [the] CAA, rather than under the City's program."  ECF No. 55, PageID.2128 (citing ECF Nos. 55-2, PageID.2164; 55-3, PageID.2226; 55-4, PageID.2279-2280).  Even so, MSHDA, HAND, and the HARAs all agreed to apply the 80-20 requirement to all Detroit-based applications.  *Id.* (citing ECF Nos. 55-2, PageID.2154, 2156-2158; 55-3, PageID.2218, 2220-2221; 55-4, PageID.2276).  In most if not all cases, the HARAs awarded Wolf "80% of the potential maximum amount of rent owed by the tenant" because his rental properties lacked either a Certificate or an Exception.  ECF No. 55, PageID.2128-2129 (citing ECF No. 47, PageID.1503, 1509); *see, e.g.*, ECF Nos. 55-7, 55-8.

D.      **Information from Supplemental Briefing on Standing**[4]

The parties' supplemental briefing adds further background on the CERA funding programs.   The City compiled data from CERA fund applicants and

---

[4] As will be explained in more detail, the information about the source of Wolf's CERA funds led this Court to question if Wolf has standing to sue the City.  This prompted the Court to order supplemental briefing on the issue of standing.  The information detailed in this subsection adds to information gleaned from Wolf's pending motion for partial summary judgment related to obstacle preemption.

MSHDA worksheets while processing rental relief applications. *See* ECF No. 66-2, PageID.3062-3063. The MSHDA portal allowed that data to be exported into an Excel-formatted report. *Id.* One of the columns in the Excel report is labeled, "Fund Source," which, relevant here and according to the City, contains one of four options:

1. 2021 – CERA Fund #1 – referring to funds issued by Treasury under the CAA to the State of Michigan, "via MSHDA and from MSHDA to HAND";

2. 2022 – CERA Fund #2 – referring to funds issued by Treasury under the ARPA to the State of Michigan, "via MSHDA and from MSHDA to HAND";

3. ERAP #2 Detroit – referring to funds issued by Treasury under the ARPA to the City; and

4. Wayne County ERAP 2 – referring to funds issued by Treasury under the ARPA to Wayne County.

ECF No. 66-2, PageID.3063; *see also* ECF No. 66-3 (Excel report for Wolf's tenants). The Excel report for all of Wolf's tenants shows that the funds they received came exclusively from funds issued by Treasury to the State, not the City. *See* ECF No. 66-3; *see also* ECF No. 66, PageID.3050-3051 (explaining that the report showed the "seven tenants whom Plaintiff assisted in applying for, or applied directly for, CERA relief identified in" his initial disclosures—highlighted in yellow in the report—and "other tenants who were not identified by Plaintiff but shared the same address as Plaintiff's tenants, 25 E. Palmer Street."); ECF No. 66-4, PageID.3070-3071 (identifying tenants in initial disclosures).

According to Louis Piszker, Chief Executive Officer of Wayne Metropolitan Community Action Agency ("Wayne Metro") (one of the relevant HARAs), Wayne Metro applied the 80-20 requirement to programs related to Detroit tenants—regardless of whether it was an MSHDA-backed or a City-backed rental assistance program.  ECF No. 64-6, PageID.2893.[5]  When asked if the 80-20 requirement was a "dictate by the City," Piszker answered, "Yes."  *Id.*  And when asked if he (or Wayne Metro) "adhered to the dictate," he confirmed that they did.  *Id.*[6]  But, important here, he also added: "And I shouldn't just say City of Detroit, but MSHDA had to agree to it also."  *Id.*

According to Wolf, emails from late October 2022 show that City officials met with MSHDA, which approved an "ERAP2 to CERA1 conversion" of funds.  ECF No. 65-2, PageID.3034, 3037.  City officials advocated for the ability to "convert[] funds prior to July 1 to maximize assistance—otherwise [the City would] not be able to maximize the available CERA1 funds from HAND/MSHDA."  *Id.* at PageID.3037.  A press release cited by Wolf indicates that the City's Detroit Housing

---

[5] Piszker's deposition transcript is attached to Wolf's motion for leave to file a third amended complaint, but is referenced throughout the supplemental brief and was discussed at the July 21, 2025 hearing.  *See* ECF No. 64-6; ECF No. 65, PageID.3022 n.1 & 2, 3023, 3026-3027 & n.3, 3029.

[6] Wolf presented an excerpt from the deposition of Michele Oberholtzer Zimmerman, "another City representative," who couldn't recall a "distinction between [the MSHDA CERA 1, MSHDA CERA 2, and City ERAP program" and had no basis to disagree with Piszker's testimony.  ECF No. 65-4, PageID.3044.  He also presented the testimony of Thomas Sperti, CFO of Wayne Metro, who identified the 80-20 requirement as a "directive from the City."  ECF No. 64-7, PageID.2988.

and Revitalization Department "spearheaded the CERA program on behalf of the City," and "partner[ed] with local nonprofits," including HAND, United Community Housing Coalition ("UCHC") (another relevant HARA), and Wayne Metro, to implement it.  ECF No. 65-3, PageID.3040-3041.

Wolf says that another document, a City memorandum seemingly to be used in discussions with MSHDA, "belie[s] the City's current position" of trying to "distance itself from the very real fact that it directed and required the HARAs to comply with" the 80-20 requirement.  ECF No. 65, PageID.3026; *see* ECF No. 64-5.  He cites three sections of this memo: (1) a section stating that "MSHDA's clear support is critical" for the success of the City's CERA program and its 80-20 requirement; (2) another indicating there would be "no back door," stating it would be "necessary to clarify that both HARAs implement the same 80/20 rules for expenditure of CERA funds in Detroit" regardless of there being a court case; and (3) a third section providing that coordination "among the organizations implementing CERA in Detroit (the two HARAs, three legal services providers and the city)" was "key" if the program was to "accomplish the goal of improving rental housing conditions while meeting federal spending deadlines."  ECF No. 64-5, PageID.2972.

Wolf also references portions of City employee Chelsea Neblett's deposition testimony.  Neblett, who, at the time of the pandemic, worked in the City's Housing

13

Revitalization Department and managed the City's CERA program, confirmed that the City never received funds relating to the MSHDA part of the CERA program. ECF No. 64-4, PageID.2962.  When asked if the City had policies that it enacted and "applied to both the MSHDA program and to the Detroit program," Neblett responded:

> No.  So the City of Detroit, we did have our own CERA policies that were shared with MSHDA, HAND and the HARAs.  They were not required to adopt those policies because we did not receive that funding.  We did run similar programs for the ease of access, but they were not required to adopt those policies.

*Id.*  She explained that although the CERA policies (like the 80-20 requirement) were used under MSHDA's program and the City's program, "they were not required to be under the MSHDA and HAND program."  *Id.*  And when asked if anyone "dissent[ed] from the application of the Detroit CERA policies in the MSHDA program," Neblett testified, "Not to my knowledge.  MSHDA nor HAND nor the HARAs dissented."  *Id.*  For its part, the City references the deposition of Terri Daniels, current Deputy Chief Financial Officer of the City's Office of Development and Grants (and Director of Grants around the time of the pandemic).  ECF No. 66-6.  Daniels confirmed that although the City received hundreds of millions of dollars in non-CERA funds from the State in 2020 and 2021, it "did not receive any CERA funding from the State of Michigan . . . ."  *Id.* at PageID.3101-3102.

E.    **Procedural History**

Some procedural background is also helpful to understand how we got here. Wolf filed his initial complaint against the City on July 11, 2023, and the City answered on August 21, 2023.  ECF Nos. 1, 11.  After a mid-September 2023 scheduling conference, the Honorable Laurie J. Michelson extended the time for filing amended pleadings to October 13, 2023.  ECF No. 14, PageID.199.  On that date, Wolf filed his first amended complaint.  ECF No. 15.  The City answered the first amended complaint on October 30, 2023.  ECF No. 16.  A week later, on November 6, 2023, Wolf moved for partial summary judgment, arguing that the Relief Acts preempt the City's 80-20 requirement because, under the doctrine of obstacle preemption, it obstructs the federal statutes' purpose of providing quick, efficient rental assistance to struggling tenants and landlords.  ECF No. 17.  The City responded to that motion on November 27, 2023.  ECF No. 21.  Before Wolf had the chance to reply, the parties attended a status conference with Judge Michelson on December 7, 2023.  *See* December 7, 2023 Minute Entry.  During that conference, the City expressed its intention to file a dispositive motion.  *See id.*

The Court, in an attempt to determine the "most efficient way to deal with the legal issues both sides intended to raise in early dispositive motions," ordered briefing on threshold jurisdictional issues, prior to a motion on obstacle preemption. *See* December 19, 2023 Text-Only Order.  On December 21, 2023, the City filed its

motion to dismiss or for judgment on the pleadings.  ECF No. 28.  The motion to dismiss raised standing as an issue but focused on statutory standing, *i.e.*, whether Wolf had a private cause of action under the Relief Acts.  *Id.* at PageID.998-1002; *see* ECF No. 41, PageID.1262-1264 & n.5 (recognizing statutory standing as "analytically distinct" question from Article III standing).

Though the City's motion was fully briefed by January 31, 2024, *see* ECF Nos. 31, 32, the case was reassigned to the undersigned on April 2, 2024, *see* Administrative Order 24-AO-007.  On July 24, 2024, Wolf moved to set a status conference and to lift a stay of discovery that Judge Michelson had imposed.  ECF No. 36; *see* December 21, 2023 Minute Entry.  Six days later, the Court held a status conference.  Relevant here, the Court denied without prejudice Wolf's then-pending motion for partial summary judgment and granted him leave to refile it once the Court issued its ruling on the City's motion to dismiss.  *See* ECF Nos. 37, 38, 39, 40.

On September 12, 2024, the Court issued an opinion resolving the City's motion to dismiss.  ECF No. 41.  This motion presented not only a complex factual and legal landscape, but also a difficult question of statutory standing and a novel illegal-exaction claim.  *See id.*  The Court granted dismissal of Wolf's illegal-exaction claim but denied it as to his takings-clause claim.  *See generally id.*  The Court, as noted above, addressed Wolf's statutory standing to sue.  *See id.* at 1262-1264.  Though the City's motion to dismiss provided case law relating to an Article

III standing analysis, the Court found that the City's argument actually related to statutory standing. *Id.* Nothing in the motion-to-dismiss briefing or Wolf's complaints drew the Court's attention to an actual Article III standing issue.

On November 26, 2024, Wolf, by agreement of the City, filed a Second Amended Complaint. ECF Nos. 46, 47. A week later, on December 3, 2024, Wolf filed his renewed motion for partial summary judgment on the issue of obstacle preemption. ECF No. 50. That motion was fully briefed by February 10, 2025. *See* ECF Nos. 55, 57.

The Court completed significant review of and work on the obstacle-preemption motion. But language in the City's response and several declarations raised a question about Article III standing. *See* ECF No. 60, PageID.2680-2682 (recounting facts that flagged standing issue).[7] The Court thus entered the order for supplemental briefing on the issues of standing and subject-matter jurisdiction. *See generally id.* That order asked the parties to file supplemental briefs on those issues and scheduled a hearing to address them before the Court. *Id.*

---

[7] As the City notes, it took issue with Wolf's standing in three of its affirmative defenses raised in its Answer to the Second Amended Complaint. *See* ECF No. 66, PageID.3051 n.1 (citing ECF No. 51, PageID.2027, 2029-2031). However, it wasn't until that information was combined with the declarations of City employees attached to the City's response to the obstacle-preemption motion, that the issues of which funding source provided Wolf with rental assistance and the potential standing problem materialized.

The parties filed their supplemental briefs on June 26, 2025. ECF Nos. 65, 66. Wolf also filed a motion for leave to file a third amended complaint to add Wayne Metro and UCHC, the two relevant HARAs, as defendants. *See* ECF No. 64. In their respective briefs, the parties grappled with the Court's traceability concern. *See* ECF No. 65, PageID.3021-3030; ECF No. 66, PageID.3051-3057. The City, however, added that Wolf also lacked standing because a favorable decision in Wolf's favor *against the City* would not redress his harm because the City did not award him funds, MSHDA—through the HARAs—did. *See* ECF No. 66, PageID.3057-3058.

On July 21, 2025, the Court held an in-person hearing on the standing issue. The parties addressed traceability, and Wolf also got to address the City's redressability argument. The Court then took the parties' argument under advisement. *See* July 21, 2025 Minute Entry; *see also* ECF No. 68 (submitting supplemental exhibits discussed at hearing as requested by the Court). The standing issue is, therefore, ripe for decision.

## II.

The Court begins by restating the general standing principles outlined in its order for supplemental briefing. *See* ECF No. 60, PageID.2679. Under the U.S. Constitution, the "Judicial Power" is limited to resolving "Cases" and "Controversies." U.S. CONST. art. III, § 2; *Turaani v. Wray*, 988 F.3d 313, 316 (6th

Cir. 2021).  This requirement, otherwise known as Article III standing, obligates a party filing suit in federal court to "show that he has 'suffered an injury in fact,' the injury is 'traceable' to the defendant's action, and a favorable decision will likely redress the harm." *Turaani*, 988 F.3d at 316 (citation omitted).  "Each element is an 'irreducible constitutional minimum.'" *Id.* (citation omitted).  Article III courts have an independent obligation to ensure they have subject-matter jurisdiction over a case, and "standing is perhaps the most important of the jurisdictional doctrines." *Burt v. Playtika, Ltd.*, 132 F.4th 398, 406 (6th Cir. 2025) (quotation marks, citations, and brackets omitted).  Courts are also obligated to consider subject-matter jurisdiction issues, like standing, *sua sponte*.  *See Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012).

The Court initially focused on traceability, *see* ECF No. 60, but the City raised a concern about redressability, too, *see* ECF No. 66, PageID.3057-3058. Traceability and redressability are therefore the focus of this Opinion.  As for injury in fact, the City concedes that Wolf had alleged (but not proven) that he suffered such an injury, so for purposes of this Motion, the Court assumes that to be true.  *See* ECF No. 66, PageID.3052.

### III.

Wolf argues that his injury—not receiving the full amount of CERA funds awarded to him—is traceable to the City (and he therefore has standing) because it required HARAs to implement the 80-20 policy when processing CERA fund

applications from Detroiters.  He says this is true regardless of which entity (the State or the City) was grantee and had control of the funds.  The Court disagrees.  And the Court agrees with the City that Wolf can't satisfy Article III's redressability requirement either.  Wolf therefore lacks standing to assert his claims against the City.

## A.    Traceability

Wolf contends that his injury is traceable to the City because it required the HARAs to apply the 80-20 requirement to CERA fund applicants from Detroit.  *See* ECF No. 65, PageID.3021-3030.  The Court disagrees—the City didn't control the funds that Wolf received or applied for, MSHDA did.  And that State entity's independent and voluntary decision to apply the 80-20 requirement severs any traceability to the City.

For traceability, courts look at whether a "defendant's actions have a 'causal connection' to the plaintiff's injury." *Turaani*, 988 F.3d at 316.  As the *Turaani* court explained (and this Court previously noted), an independent action by a third party not before the court is usually insufficient to satisfy this element:

> Indirect harms typically fail to meet this element because harms "result[ing] from the independent action of some third party not before the court" are generally not traceable to the defendant.  That means that, unless the defendant's actions had a  "determinative or coercive effect" upon the third party, the claimant's quarrel is with the third party, not the defendant."

*Id.* (citations omitted; alteration in original); *see* ECF No. 60, PageID.2680. More to the point here, "'an injury that results from [a] third party's voluntary and independent actions' does not establish traceability;" which means the City must have "do[ne] more"—*e.g.*, issuing "a 'command' of the third party's actions." *Turaani*, 988 F.3d at 317 (quoting *Crawford v. United States Dep't of Treasury*, 868 F.3d 438, 457 (6th Cir. 2017)). This means that "[a]n indirect theory of traceability requires that the government"—here, the City—"cajole, coerce, [or] command" the third party—here, the State (not the HARAs)—into taking some action. *Id.* at 316 (citing *Crawford*, 868 F.3d at 457). But when a third party exercises its "'legitimate discretion,'" that "breaks the chain of constitutional causation." *Id.* at 317 (citing *ASARCO Inc v. Kadish*, 490 U.S. 605, 615 (1989), and *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42-43 (1976)).

The Court finds that Wolf has failed to establish that his injury is traceable to the City. To start, the evidence establishes that the funds Wolf either received or applied for were funds disbursed to and controlled by the State of Michigan through MSHDA. *See* ECF No. 66-2, PageID.3062-3063; ECF No. 66-3; ECF No. 66-4; *see also* ECF No. 64-4 (confirming that the City never received funds relating to the MSHDA part of the CERA program); ECF No. 66-6 (confirming that the City didn't receive any CERA funding from the State of Michigan). The City thus had no control over these funds. *See* ECF No. 55-2, PageID.2153 (acknowledging that the

City couldn't control how the HARAs processed state-based funds).  True, the 80-20 requirement was the City's brainchild.  *See* ECF No. 55-2, PageID.2153-2154 (noting that the City informed MSHDA, HAND, and the HARAs it was developing a CERA program because it expected to receive funds under the APRA and advising of 80-20 requirement).  It's also true that the City lobbied for the State to apply the 80-20 requirement to funding distributions for Detroit-based applicants.  *See* ECF No. 55-2, PageID.2153-2155 (indicating that the City asked MSHDA, HAND, and the HARAs to follow "the same process" for Detroit applicants under the CAA and they did so); ECF No. 64-5, PageID.2972 (outlining in memorandum the importance of MSHDA's support for the City's program, across-the-board application of the 80-20 requirement, and coordination among implementing organizations).  But successfully lobbying for the State to apply the requirement is a far cry from the City coercing, cajoling, or commanding the State into doing so. *See Turaani v. Wray*, 440 F. Supp. 3d 733, 738 (E.D. Mich. 2020) ("[M]erely acting to potentially influence the 'voluntary and independent' decision of a third-party does not itself create a direct and traceable injury"), *aff'd by* 988 F.3d at 313 (citing *Crawford*, 868 F.3d at 457).  The State—not the City—ultimately used its discretion in making the independent, voluntary decision to implement the 80-20 requirement and require HARAs to apply it to Detroit-based applicants.  That independent, voluntary, and

discretionary decision by the State thus severs the causal chain for traceability purposes and deprives Wolf of Article III standing.  *See Turaani*, 988 F.3d at 317.

Nothing in the evidence Wolf has presented suggests otherwise—not even the deposition testimony of Louis Piszker, CEO of Wayne Metro.  Wolf leans on excerpts from Piszker's deposition to support his claim that the City mandated the application of the 80-20 requirement, even when the funds came from MSHDA.  *See* ECF No. 64, PageID.3022 n.1 & 2, 3023, 3026-3027 & n.3, 3029; *see also* ECF No. 64-6.  He argues that implementation of the 80-20 requirement by the HARAs wasn't voluntary or "based upon a mere 'request'" as Neblett suggested.  ECF No. 65, PageID.3022; *see* ECF No. 55-2, PageID.2153-2154.  Wolf says Piszker's testimony and several emails instead demonstrate that the City worked "tirelessly" to ensure its 80-20 requirement was "implemented and followed by the HARAs and approved by MSHDA," which made it a "*requirement* performed at the City's direction."  ECF No. 65, PageID.3022 n.2 (emphasis in original but formatting altered).  Wolf continued this reliance at the July 21, 2025 hearing.  And he contends that the HARAs "did not implement—and would not have implemented—the '80/20' Policy absent the City's requirement to do so."  *Id.* at PageID.3026-3027.

To support these assertions, Wolf quotes the following exchange from Piszker's deposition:

> *Q*.  All right.  When you started administering the program, were you told that you were going to have to adhere to the 80-

20 policy? And let's agree what we're talking about. The 80-20 policy, first of all, was dictated by the City of Detroit, correct?

*A.* Yes.

*Q.* All right. And you were required to apply that policy in administering all three programs, correct?

*A.* The programs that related to city—in the City of Detroit tenants, yes.

*Q.* So you were required to do it for MSHDA, CERA 1, MSHDA CERA 2 and the City of Detroit ERAP program?

*A.* Correct.

*Q.* And that was by the City of Detroit; you didn't come up with it yourself?

*A.* No. That's above our pay grade.

*Q.* But it was a dictate by the City?

*A.* Yes.

*Q.* And you adhered to the dictate?

*A.* We adhere[d] to it, yes. *And I shouldn't just say City of Detroit, but MSHDA had to agree to it also.*

ECF No. 64-6, PageID.2893 (emphasis added); ECF No. 65, PageID.3026-3027.

Wolf omitted the emphasized portion of Piszker's deposition from his supplemental brief. But that testimony is crucial to the standing issue. Here's why. First, that Piszker confirmed the 80-20 requirement was a "dictate by the City" doesn't mean the City coerced or otherwise required the State to apply the requirement to funds the State controlled. Before confirming the 80-20 requirement as a City dictate, Piszker acknowledged that Wayne Metro had to apply the 80-20

requirement to each round of funding for "MSHDA, CERA 1, MSHDA CERA 2 *and* the City of Detroit ERAP program[.]"   ECF No. 64-6, PageID.2893 (emphasis added).   However, Wolf's problem is his premise.   That Wayne Metro had to apply the 80-20 requirement in each round of funding doesn't mean the City "dictated" it during each of those rounds.   When it came to MSHDA funds—the funds Wolf received or applied for—it was the State's dictate, *not* the City's.

And second, MSHDA's decision to apply the 80-20 requirement was a voluntary one, even if the City asked MSHDA to do so.   *See Turaani*, 440 F. Supp. 3d at 738.   Nothing Wolf has presented suggests or supports that the City coerced MSHDA into applying the 80-20 requirement.   And that's problematic for Wolf because that's what's required for Wolf's injury to be traceable to the City—the City must have issued "a 'command' of the third party's actions."   *Turaani*, 988 F.3d at 317.[8]   Indeed, the evidence shows that MSHDA retained full discretion in deciding whether to apply the requirement, which dooms traceability.   *See id.*

Wolf also hasn't shown that the City did, or even had the ability to, command that the State apply the 80-20 requirement.   Nor, in the Court's view, could he, given

---

[8] At the hearing, Wolf expressed his belief that the standard was not coercion but simply that the City had influence over the third party.   That's not the standard.   *See Turaani*, 988 F.3d at 316-17 (stating the standard as requiring the government's conduct to have had a "determinative or coercive effect" on the third party; in other words, to "cajole, coerce, [or] command" the third party to take some action).   To the extent Wolf's argument relates to the "determinative" language mentioned in *Turaani*, *see* 988 F.3d at 316, that prong doesn't help Wolf either.   What was determinative of the HARAs' retention of Wolf's funds was *the State's* decision to implement the policy, not the fact that the City thought up the policy.

the hierarchical relationship between state and local governments.  *See City of Columbus v. Ours Garage & Wrecker Serv., Inc*, 536 U.S. 424, 433 (2002) (recognizing that "local governmental units are created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them in its absolute discretion."); *see also City of Taylor v. Detroit Edison Co.*, 715 N.W.2d 28, 31 (Mich. 2006) ("[Local governments] have no inherent jurisdiction to make laws or adopt regulations of government; they are governments of enumerated powers, acting by a delegated authority . . . .").  And although Wolf alleges that the HARAs were the City's agents, *see* ECF No. 47, PageID.1501, 1518, 1522, 1527, the evidence shows that when it came to the funding Wolf received, the HARAs were acting as agents of the State (through MSHDA), not the City, *see* ECF No. 55-2, PageID.2152-2155, 2164; ECF No. 55-3, PageID.2216, 2226; ECF No. 55-4, PageID.2274, 2279-2280; ECF No. 64-4, PageID.2962; ECF No. 66-2, PageID.3062-3063; ECF No. 66-3; ECF No. 66-6, PageID.3101-3102.[9]

---

[9] This point makes amendment of the complaint to add Wayne Metro and UCHC as defendants futile.  Even if those two HARAs are typically local-level entities as Wolf claims (*see* ECF No. 65, PageID.3023 (citing ECF No. 65-3, PageID.3040-3041)), *i.e.*, they're usually agents of the City, they weren't acting in that capacity here—they were agents of the State.  *See* ECF No. 55-2, PageID.2152-2155, 2164; ECF No. 55-3, PageID.2216, 2226; ECF No. 55-4, PageID.2274, 2279-2280; ECF No. 66-2, PageID.3063; ECF No. 66-3.  And as agents of the State, they cannot be held liable under § 1983.  *See Cady v. Arenac Cnty.*, 574 F.3d 334, 345 (6th Cir. 2005); *Pusey v. City of Youngstown*, 11 F.3d 652, 659 (6th Cir. 1993).  Wolf's motion for leave to file a third amended complaint to add Wayne Metro and UCHC as defendants is therefore denied as futile.

Wolf further contends that the standing issue turns on whether the HARAs "could have independently chosen to 'opt out' of the City's '80-20' Policy." ECF No. 65, PageID.3028. But again—with respect to the funds that Wolf received or applied for—it wasn't the City's policy. Yes, the City may have come up with the policy, but MSHDA, the State entity, approved and implemented it. *See* ECF No. 64-6, PageID.2893. So, while the HARAs may have had to apply the 80-20 requirement, they did so at the State's direction, *not* the City's. Thus, even if the HARAs couldn't independently opt out of the 80-20 requirement, it would have been the State's fault, not the City's. And, again, nothing Wolf presented suggests the City coerced or otherwise commanded the State to require HARAS to apply the requirement. To the contrary, the evidence shows that MSHDA applied it voluntarily at the City's request. *See* ECF No. ECF No. 64-6, PageID.2893; *see also* ECF No. 64-4, PageID.2962 (deposition of Chelsea Neblett stating that although the City had its own "CERA policies that were shared with MSHDA, HAND, and the HARAs" those entities were "not required to adopt those policies because we did not receive that funding.").

Wolf also asserts that "literally hundreds of internal City emails" show that the City "worked tirelessly to ensure that the City's '80/20' requirement was implemented and followed by the HARAs and approved by MSHDA—even before the City implemented its own ERAP program." ECF No. 65, PageID.3022 n.2. Wolf

doesn't support that footnote with citations to those emails but, instead, to Piszker's deposition testimony. *See id.* Wolf does, however, provide the Court with three email chains that he says further support his position that the City mandated application of the 80-20 requirement to the funds he received. None carry the day.

The first email chain between Neblett and other city representatives talks about an "ERAP2 to CERA1 conversion" approved by a MSHDA representative (Kelly Rose). *See* ECF No. 65-2. This chain doesn't establish that the City mandated anything—in fact, it shows the opposite—it shows the State's independent decision making relating to the CERA1 funds. Neblett's emails establish that the City needed State approval for the apparent funding swap. *See id.* at PageID.3034 ("We . . . met with MSHDA today and Kelly Rose approved the ERAP2 to CERA1 conversion") and *id.* at PageID.3037 ("Please note that we are going to set up a meeting with MSHDA to advocate for allowability for converting funds prior to July 1 to maximize assistance – otherwise we will not be able to maximize the available CERA1 funds from HAND/MSHDA."). So, this first email chain doesn't help Wolf.

Neither does the second. The second email chain, between Neblett and a representative from UCHC (Charlene Snow), deals with duplicative case processing between UCHC and Wayne Metro. ECF No. 68-1, PageID.3109-3112. It does, however, mention the 80-20 requirement and how it had "slowed down the process of [UCHC] doing [its] cases." *Id.* at PageID.3111. But this does nothing to show

28

coercion, cajoling, or commanding by the City directed at the State. *See Turaani*, 988 F.3d at 316-17. True, these emails may show coordination between the City and the HARAs. Yet these emails were sent in September 2021, six months after the ARPA was signed into law. And that matters because the email isn't clear on whether it's dealing with City-controlled ERAP funds, or State-controlled CERA-2 funds. That's relevant because, to reiterate, Wolf received or applied for rental assistance funds from the State's program, not the City's program. So, like the first email thread, this second group of emails is unhelpful to Wolf.

The third and final email chain, between Kelly Rose of MSHDA and several City representatives, doesn't fare any better. *See* ECF No. 68-2, PageID.3113-3116. Rose's emails noted the slow processing speed of applications by the HARAs, asking the cause and how they could resolve the issue. *Id.* at PageID.3114-3115. But, important to the traceability inquiry, Rose also indicated that if the number of processed cases didn't substantially improve, they would "need to revisit the certificate of compliance issue." *Id.* That works *against* Wolf's traceability argument, not in favor of it, because it shows that the State's application of the 80-20 requirement was a voluntary decision within its discretion, not the result of coercion, cajoling, or a command from the City. *See Turaani*, 988 F.3d at 317 (rejecting claim that actions of FBI agent in approaching firearm dealer and expressing issues "'with the company' [the plaintiff] 'keeps'" were enough to

establish traceability after firearm dealer declined to sell firearm to the plaintiff). The State's exercise of its "'legitimate discretion'" to implement the 80-20 requirement therefore "breaks the chain of constitutional causation" and prevents Wolf from establishing Article III's traceability requirement. *Id.* (citing *Kadish*, 490 U.S. at 615, and *Simon*, 426 U.S. at 42-43); *see also id.* at 317 ("Agent Chambers left the dealer with that discretion.  He did not command or coerce; he explained only the reason for the inquiry.  Article III demands more.").

The parties quarrel over the applicability of *Turaani*, a case involving a plaintiff who tried to purchase a firearm at a gun show. *Turaani*, 988 F.3d at 315; *see* ECF Nos. 65, PageID.3027-3029; 66, PageID.3052-3055.  After a three-day hold was put on the sale, an FBI agent went to the gun dealer's home ("which doubled as his place of business") and expressed concerns about the "company [the plaintiff] keeps." *Turaani*, 988 F.3d at 315 (internal quotation marks omitted).  When the plaintiff tried to buy the gun a few days later, the dealer mentioned his "visit from the FBI." *Id.*  Though the dealer still could have sold the gun (as the three-day hold hadn't returned any "prohibitions on the sale"), he advised the plaintiff he was "no longer comfortable doing so." *Id.* (internal quotation marks omitted).  The plaintiff then sued, which prompted a government motion to dismiss for lack of standing. *Id.* at 316.  The district court granted the motion, explaining that the plaintiff had failed to show that his injury was traceable to the FBI's actions because the government

didn't require the gun dealer to not sell the gun; it was instead the gun dealer's "independent choice" not to do so.  *Id.*

The Sixth Circuit affirmed.  *Turaani*, 988 F.3d at 315, 318.  Focusing on traceability, the court concluded that the plaintiff's injury "stem[med] from the actions of the gun dealer, not the FBI."  *Id.* at 316.  Now-Chief Judge Sutton explained that the three steps the FBI agent took were insufficient to establish traceability.  *Id.*  The first—a "visit[] [with] the dealer to 'speak with' him about [the plaintiff]"—"d[id] not suffice" to establish traceability because "[c]ontact does not equal coercion."  *Id.*  The second—the agent's request to "see the information [the plaintiff] provided when he tried to purchase the gun"—was "not enough" because then "every law-enforcement inquiry could generate a lawsuit premised on an inquiry."  *Id.*  And the third—the agent's display of a photo of the plaintiff with an "unknown man of apparent Middle Eastern descent" and statement that he "had concerns 'with the company' [the plaintiff] 'keeps'"—was "not enough either" because "[p]assing along information, and ambiguous information at that, is a distant cry from forcing action."  *Id.*

Wolf argues *Turaani* is distinguishable.  *See* ECF No. 65, PageID.3027-3029. He says it's "clear" that Turaani's injury "flowed from the gun dealer's independent and voluntary decision not to sell him a gun," not from governmental influence.  *Id.* at 3028-3029.  And he notes that although the gun dealer in *Turaani* could have

31

completed the transaction (the FBI had, after all, left it up to his discretion), he chose not to.  *Id.*  This case is different, though, Wolf contends, because "the City directed the HARAs to implement the '80/20' Policy and the HARAs acted pursuant to the direction and authorization of the City when they escrowed CERA Funds under the City's Policy."  *Id.* at PageID.3029.  So, in Wolf's view, the HARAs' implementation of the 80-20 requirement was "not independent of the City's—*and only occurred because of the City's directive*."  *Id.* (emphasis in original but formatting altered).

Wolf is looking at this the wrong way.  It's not whether the HARAs' actions were independent of the City's.  For purposes of the funds that Wolf received or applied for, they were.  And that's because Wolf's funds came from the State, not the City.  Any directive to the HARAs requiring them to apply the 80-20 requirement to Detroit applicants for CERA-1 or CERA-2 funds came from the State.  Therefore, the issue for traceability is whether the State decided to adopt the 80-20 requirement on a voluntary and independent basis, at its own discretion, and without any coercion, cajoling, or command by the City.  It was.  And like the plaintiff in *Turaani*, Wolf never asserts and hasn't presented any evidence that the City commanded or coerced the State to adopt the 80-20 requirement.  *See Turaani*, 988 F.3d at 317.  The Court is thus unpersuaded by Wolf's reading of *Turaani*.

Wolf further argues that "even if the City did not strictly direct or control the HARAs['] actions, at the very least the City's dictates were a 'motivating factor' in

32

the HARAs['] 'injurious actions' and Plaintiff has met Article III standing's 'traceability' requirement."  ECF No. 65, PageID.2065-2066.  He seeks refuge in *Parsons v. U.S. Dep't of Justice*'s statement that "[i]n the nebulous land of 'fairly traceable,' where causation means more than speculative but less than but-for, the allegation that a defendant's conduct was a motivating factor in the third party's injurious actions satisfies the requisite standard."  801 F.3d 701, 714 (6th Cir. 2015); *see* ECF No. 65, PageID.3024.  Wolf's argument misses the mark because when it came to the funds Wolf received or applied for, these were the "dictates" of the State, *not the City*.  Again, the City may have successfully lobbied for application of the 80-20 requirement by the State.  *Cf. Turaani*, 440 F. Supp. 3d at 738.  But it was the *State's dictates* that were a motivating factor in the HARAs' allegedly "injurious actions."  *Parsons*, 801 F.3d at 714; *see also Turaani*, 988 F.3d at 316-17 (presenting hypotheticals demonstrating there is no harm traceable to a voluntary action of a third party).

Parsons is also distinguishable because it presents a power dynamic between governmental entities that's the inverse of the dynamic here.  There, state and local law enforcement agencies harassed fans of a musical group after the Department of Justice labeled the group as a gang.  *See Parsons*, 801 F.3d at 708-09.  The Sixth Circuit in *Parsons* concluded that the plaintiffs had sufficiently pleaded that the "DOJ gang designation" motivated the law enforcement officers' injurious conduct.

*See id.* at 713-15.  But as the *Turaani* court recognized, the imbalance of the "cooperative relationship between local and national law enforcement" may compel local law enforcement to feel like it must "follow the lead of federal law enforcement and take action" on information from the Department of Justice.  *See Turaani*, 988 F.3d at 317 (quoting *Vapor Tech. Ass'n v. U.S. Food & Drug Admin.*, 977 F.3d 496, 502 (6th Cir. 2020) (per curiam)) (quotation marks omitted).  As described earlier, that same imbalance doesn't exist when it's the City supposedly coercing the State.  So, the Court finds *Parsons* inapposite.

Sixth Circuit decisions after *Parsons* support this conclusion.  Take, for example, *Changizi v. Dep't of Health & Human Servs.*, 82 F.4th 492 (6th Cir. 2023), cited by the City.  There, Twitter users banned for posting alleged COVID-19 misinformation sued the federal government instead of Twitter.  *Id.* at 494-96.  After the users sued, the district court dismissed the complaint for lack of standing and failure to state a claim.  *Id.* at 494, 96.  The Sixth Circuit upheld the dismissal of the plaintiffs' claims because they hadn't shown that their bans were traceable to the federal government (there, the U.S. Department of Health and Human Services).  *Id.* at 496-98.  In rejecting the plaintiffs' position, the *Changizi* court explained, in part, that the plaintiffs had failed to show that Twitter's decision to "enforce[] its own COVID-19 policy did not result from its 'broad and legitimate discretion' as an independent company."  *Id.* at 497 (citing *Kadish*, 490 U.S. at 615).  It also concluded

that the plaintiffs' complaint fell short because although they claimed there were behind-the-scenes conversations between Twitter and the federal government, their complaint lacked details about those communications or their contents. *Id.*

Like in *Changizi*, Wolf hasn't shown that the City somehow compelled or coerced the State to implement the 80-20 requirement as opposed to it simply exercising its discretion as an independent governmental entity. *See* 82 F.4th at 497. And like in *Changizi*, though Wolf contends there are countless emails and other communications from the City "dictating" that the HARAs apply the 80-20 requirement to every Detroit applicant, he hasn't provided the evidence that matters: a dictate from the City that the *State* apply it to every Detroit applicant. ECF No. 65, PageID.3022 n.2; *Changizi*, 82 F.4th at 497.

In sum, the Court finds that Wolf's alleged injury—retention of rental assistance funds—is not traceable to the City. Though the City came up with the 80-20 requirement, the State's independent, voluntary, and discretionary decision to implement it severed the chain of constitutional causation. This precludes Wolf from establishing traceability, so he lacks standing to sue the City.

## B.     Redressability

The City also argues that Wolf can't establish redressability. Though the Court's traceability analysis resolves the standing issue, the Court addresses redressability for completeness. The Court agrees with the City: a decision in Wolf's

35

favor wouldn't redress his alleged harm because the funds he claims the City should release to him aren't the City's to release—they're the State's funds.

To determine if an injury is redressable, courts "consider the relationship between the 'judicial relief requested' and the 'injury' suffered." *Sierra Club v. Tenn. Dep't of Env't & Conservation*, 133 F.4th 661, 672 (6th Cir. 2025) (quoting *California v. Texas*, 593 U.S. 659, 671 (2021)) (quotation marks and citation omitted). "If that relief does nothing to redress the alleged injury, a court could do nothing more than issue a jurisdiction-less advisory opinion." *Id.* (quotation marks and citations omitted).

Here, Wolf alleges he was injured when the 20% of relief funds were unpaid and held in escrow. However, an order of the Court requiring the City to reimburse Wolf for improperly taken or withheld funds wouldn't redress his injury. Yes, reimbursement of the allegedly outstanding 20% would make Wolf whole. But ordering *the City* to reimburse him would have no effect because the City never awarded Wolf any funds—the State did. *See* ECF Nos. 55-2, PageID.2164; 55-3, PageID.2226; 55-4, PageID.2279-2280; 66-2, PageID.3063; *see also* ECF No. 66-3 (Excel report for Wolf's tenants). So, as the City argues (and the Court agrees), because Wolf's applications were "processed under the MSHDA program" with MSHDA's funds, the City didn't have "any control over the disposition of these

funds." ECF No. 66, PageID.3058.  An order directing the City to disburse to Wolf the allegedly owed 20% would therefore fail to redress his injury.

**IV.**

Accordingly, the Court **DISMISSES** Plaintiff's Second Amended Complaint (ECF No. 47) because Plaintiff lacks standing to sue the City.

**IT IS FURTHER ORDERED** that Plaintiff's Renewed Motion for Partial Summary Judgment on the Issue of Obstacle Preemption (ECF No. 50) is **DENIED AS MOOT** and Plaintiff's Motion for Leave to File Third Amended Complaint to Add Third Party Defendants (ECF No. 64) is **DENIED AS FUTILE**.

**IT IS SO ORDERED.**

Dated: August 18, 2025                         s/Brandy R. McMillion
      Detroit, Michigan                     BRANDY R. MCMILLION
                                    United States District Judge